## EDWARD L. WIGHT ET AL. *vs.* BALTIMORE AND OHIO RAILROAD COMPANY ET AL.

*Constitutional Law—Police Power—Assignments of Wages— Regulation by Statute.*

It is within the police power of the State to throw around transactions involving the assignment of wages such safeguards as will protect the wage earner from the greed and rapacity of persons who might exploit his necessities and misfortunes. p. 72

While the right to pursue any lawful occupation or calling is generally if not universally recognized as property within the "due process" clause of the Federal Constitution, yet the right of the State to regulate such a business when its unregu-

lated operation may injuriously affect the welfare of others is equally well settled.                    p. 73

The State, in the exercise of the police power, may adopt regulations respecting the exercise of a lawful trade or business, provided such regulations are not so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law.                    p. 74

The business of money lenders or wage brokers is of such a public nature that it may properly be regulated by the State.
                    pp. 74-75

The general rule that all competent persons are free to make any contracts not contrary to public policy or positive law is subject to the qualification that the State in the exercise of its police power and in the interest of the public welfare may regulate and limit that right.                    pp. 74, 75

Acts 1906, ch. 399, in making essential to the validity of an assignment of earned wages its acknowledgment by the assignor, and also by his or her wife or husband, before a justice of peace, its entry on the justice's books, the service of a copy on the employer in the same manner as process is served in chancery, and an oath by the assignor that he has not paid and will not pay more than six per cent. per annum on the sum borrowed, prescribes no unreasonable regulation of such assignments.
                    pp. 76, 77

Acts 1906, ch. 399, regulating assignments of earned wages, in providing, in section 12, that proof of service on the employer of a copy of the assignment shall be by admission thereof in writing by the employer, endorsed on the original assignment, merely affords an alternative mode of service, and does not exclude other proof of service, such as that provided in section 11, or the testimony of any one making actual service on the employer.                    p. 77

As regards the validity of statutes regulating the assignment of wages, there is no distinction between a statute which deals with earned wages, and one which deals with unearned wages, since the right to earn wages is as much property as earned wages and as much within the protection of the "due process"

clause of the Fourteenth Amendment of the Federal Constitution.                                                     p. 78

A distinction, in connection with the question of the validity of a statute regulating assignments of earnings, between the regulation of assignments of salaries, and the regulation of assignments of wages, is too refined and delicate to justify its recognition.                                             p. 79

*Decided June 7th, 1924.*

Appeal from the Circuit Court of Baltimore City (CARROLL T. BOND, J.).

Bill by Edward L. Wight and George H. Rosenbush, trading as the Baltimore Finance Company, against the Baltimore and Ohio Railroad Company and W. L. Miller. From a decree for defendants, plaintiffs appeal. Affirmed.

The cause was argued before PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Joseph C. France* and *Allan H. Fisher,* with whom were *Jerome Sloman* and *Fisher & Fisher* on the brief, for the appellants.

*Duncan K. Brent* and *David G. McIntosh, Jr.,* with whom was *Allen S. Bowie* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The single question presented by this appeal is whether chapter 399 of the Acts of 1906, codified as sections 11 to 17 inclusive of article 8 of the Code of P. G. L. of Md., conflicts with any provision of the State or Federal Constitution, and that question arises in this way:

On July 30th, 1923, the Baltimore and Ohio Railroad Company owed Wm. L. Miller, one of its employees, $21.50 in earned wages and on that day Miller offered to sell and assign his claim for that amount to the appellants in this case for $20. They accepted his offer and he accordingly assigned the claim to them, and they paid the $20 to him and notified the railroad company, which at that time owed Miller

an amount equal to the claim of $21.50 of the assignment, but that company refused to recognize it and informed the appellants that it would pay Miller the whole amount due him as though it had not been made. The appellants thereupon filed in the Circuit Court of Baltimore City a bill of complaint against both Miller and the railroad company, in which they set out the facts referred to, with other facts not material to the question before us and which need not be further referred to here, and in that bill they asked for the following relief:

"(a) Discovery as to the said defendants and each of them and that they be required to discover the entire earnings of the said defendant, Miller, in the capacity of brakeman for the month of July, 1923.

"(b) That the said court may assume jurisdiction over said fund and determine the rights of the parties hereto.

"(c) That the plaintiffs may have a decree *in personam* against each of said defendants for said sum of $21.50."

The defendants answered the bill severally, and in their answers among other things they averred that the assignment upon which the appellants relied was not made in accordance with the requirements of sections 11 to 17 of article 8, C. P. G. L. of Md., and was consequently void. There were other allegations of fact in the answer which under the pleadings are not material to this inquiry and are not before us, and will not therefore be considered.

The complainants demurred to so much of the answer as relied upon the statute referred to, on the ground that it violated both the State and Federal Constitutions and was void; and as to the remaining averments of fact in said answer they joined issue. So that the whole case finally turns upon the constitutionality of that statute, since it conclusively appears that the assignment does not comply with its terms and that if the act is valid the assignment is for that reason invalid.

That act added eight new sections to the 8th article of the C. P. G. L. of Maryland entitled "Assignment of Choses in

Action," numbered 11 to 18. Sections 11-12-13, read as follows:

"Section 11. No assignment of wages or salary shall be valid so as to vest in the assignee any beneficial interest, either at law or in equity, unless such assignment be in writing, signed by the assignor and acknowledged in person by him or her before a justice of the peace in and for the city or county, as the case may be, in which the assignor resides, and entered on the same day by said justice of the peace upon his docket; and unless further, within three days from the execution and acknowledgment of said assignment a true and complete copy thereof, together with the certificates of its acknowledgment, be served upon the person, firm or corporation by whom said wages or salary are due or to become due, in the same manner that the summons in chancery is now required by law to be served; provided, however, that no assignment of wages or salary by a married person shall be valid unless the same is also executed and acknowledged as above by the assignor's wife or husband, as the case may be.

"Section 12. That proof of said service, as provided for in the preceding section, shall be by admission thereof in writing by the person, firm or corporation, his, their or its agent, on the original assignment, which admission of service shall also be entered by said justice of the peace upon his docket within two days thereafter.

"Section 13. That in addition to said acknowledgment to be made by said assignor, he or she, as the case may be, shall make affidavit that he or she has not paid, and will not, directly or indirectly, pay more than the legal rate of six per centum per annum on any sum borrowed, or permit a deduction from said sum so loaned to him or her at the time of said loan, or any time thereafter, of more than a sum equivalent to six per centum per annum for the time said loan is made."

Section 14 defines the term "assignment"; section 15 deals with the effect of usury in connection with assignments under the act; section 16 refers to the assignment of future earnings, and section 17 prescribes and defines the consequences resulting from a violation of the act, as well as the remedies which may be pursued in such a case. We have said that the assignment was not executed in compliance with the terms of the act and that conclusion is inevitable from a comparison of its terms with those of the act.

The assignor signed and sealed an application which in part read as follows:

"Application to Sell an Undivided Interest in My Account for Wages or Salary. * * *

"I hereby make application to sell to Baltimore Finance Co. an undivided interest in an account due me by my employer for wages or salary already earned during the months of July, 1923, in the capacity of brakeman, * * *

"This transaction is an absolute and unconditional sale, and not a loan or advance of money, and is not a discount; I am not a debtor to the purchaser; this is an original transaction, and is not a renewal or extension of any kind. I agree to take 20 dollars for said account and hereby authorize the purchaser, in my name and stead, and as my attorney in fact, to sign any and all checks, vouchers, receipts and acquittances necessary and proper to be signed in order to collect said account."

The "assignment," which is also under seal, and signed by the assignor, but neither acknowledged nor sworn to, contains in part these statements:

"For value received, I hereby sell to Baltimore Finance Co., doing business in the City of Baltimore, Maryland, an undivided interest in my account for salary or wages, already by me earned during the month of July, 1923, said interest amounting to $21.50 and due me by Baltimore & Ohio R. R. Co., my employer. I hereby direct my said employer to pay to Baltimore Finance Co. said amount. * * *

"This is an absolute and unconditional sale of an undivided interest in said account, and is not a loan or advance of money, and is not a discount; I am not a debtor to the purchaser; this is an original transaction, and is not a renewal or extension of any kind. * * *

"I hereby authorize the purchaser of this account, in my name and stead, and as my attorney in fact, to sign any and all checks, vouchers, receipts and acquittances necessary and proper to be signed in order to collect said account and to evidence the payment of the same."

These two documents appear to constitute a somewhat ingenious, very sincere and needlessly elaborate effort to ecape the provisions of the act in question. But as the assignment is obviously within the scope of the act, the appellant's contention that it is valid rests necessarily upon the propositions (1) that the act itself is unconstitutional and, in support of that contention, they say: "So far as it deals with the claims for wages or salaries actually earned, it is clearly an unwarranted interference with the owner's liberty of contract and right of property; and is void under the 'due process' guaranty of our fundamental law"; (2) that the provisions of the act are impossible of performance, and (3) that it has been repealed by implication by the passage of the Petty Loans Act.

This act is remedial in character and its apparent purpose is to throw around transactions such as that involved in this case such safeguards as will protect the wage earner who may be a party to them from the greed and the rapacity of unscrupulous persons who might exploit his necessities and misfortunes to his loss and their profit. That purpose is certainly within the police power of the State, and the only question open is whether in its attempt to effect that purpose the Legislature has in this act violated any of the privileges secured to the citizen by the guaranties of the State or Federal Constitutions. And in dealing with that question we cannot disregard the consideration that any act designed

to accomplish such a purpose must be sufficiently definite and comprehensive in its selection of the means and methods designed to effect it to frustrate the energy and ingenuity of the class at whom it is aimed, who so often regard the privilege of exploiting the necessities of borrowers as a vested property right. And while there should be no paltering with any real assault upon the rights, privileges and immunities guaranteed to the citizen by the Constitutions of this State or of the United States, on the other hand there can be no justification for resorting to strained, forced, technical, or tenuous reasoning in the construction of those charters in order to strike down an act of the Legislature passed in the ostensible exercise of the police power of the State and in the public interest.

The first concrete objection to the act is that it deprives the appellants of their property without due process of law. But the force of that objection is not apparent. The act took from the appellants no property, unless the business of buying without regulation or restraint wages at a discount, is property. And while, under the facts of this case, we know of no definition of "property" which could include that privilege, yet if that privilege could be considered property, the appellants were not deprived of it without due process of law, whether we assume that the word "property" relates to the particular assignment involved in this case or to the privilege of buying such assignments generally as a business. Because there is nothing in the act which purports to affect rights acquired in transactions prior to its passage, and all transactions after its passage were carried on with knowledge and notice of its existence and subject to its terms. These principles are in accord with the general trend of judicial authority and may be regarded as established. For while the right to pursue any lawful occupation or calling is generally if not universally recognized as property within the "due process" clause of the Federal Constitution, yet on the other hand the right of the State to regulate such a business when its unregulated operation may injuriously affect the welfare of others is equally well settled. For, as said in *Schaake* v.

*Dolley,* 85 Kan. 600: "The right to liberty and the pursuit of happiness includes the right to employ one's faculties and property in a gainful occupation of his own choosing. This right, however, has never been regarded as absolute by either the English or the American law. While it is properly spoken of as fundamental and inalienable, it is nevertheless qualified to the extent that the sovereign power may interfere with its enjoyment through regulations necessary or proper for the mutual good of all the members of the social whole. One of the highest ends of civil government is the protection of the individual in the enjoyment of the fundamental rights enumerated in the Bill of Rights. The idea of those rights should be pervasive in civil institutions or government is likely to become a nuisance and a scourge. But if the individual insist upon them to the detriment of other individuals possessing the same rights, or to the detriment of the security, good order, common good, and general welfare of the entire social body of which he is a member, he is likely to become a nuisance." And whether the operation of a given business or occupation will have such an effect is, as stated in *Gundling* v. *Chicago,* 177 U. S. 183, a question for the State to determine in the proper exercise of the police power. In that case the Court in stating that principle said: "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be and to what particular trade, business or occupation they shall apply, are questions for the State to determine, and their determination comes within the proper exercise of the police power by the State, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for Federal interference." See also 6 *R. C. L.,* p. 217, 266, 269; 12 *C. J.* 958.

That the business of the appellants is one which the State may properly under the police power regulate we do not

doubt.    In the very nature of the thing, money lenders or wage brokers carry on a business public in its nature and, in dealing with necessitous persons, often incapable through ignorance or the impelling force of their needs from protecting themselves, have opportunities for extortion and unfair dealing which, unless restrained by proper and reasonable regulations, they may use to the detriment and injury of their patrons.

The question finally comes then to the reasonableness of the regulations provided in the statute in question, but before dealing with that question we will advert for a moment to the objection that the regulations in the statute under consideration unreasonably restrain the freedom of contract, guaranteed to the appellants by the "due process" clause of the Federal Constitution.    While it is true as a general rule that all competent persons are free to make any contracts they please which are not contrary to public policy or positive law, that rule is subject to the qualification that the State in the exercise of its police power and in the interest of the public welfare may regulate and limit that right.    12 *C. J.* 948. In *Taylor on Due Process of Law,* 493, the author, after quoting this statement from *Adair* v. *United States,* 208, U. S. 261, "Such liberty and right embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's labor; each right, however, being subject to the fundamental condition that no contract, whatever its subject matter, can be sustained which the law, *upon reasonable grounds, forbids as inconsistent with the public interests, or as hurtful to the public order, or as detrimental to the common good,"* said: "In the italicized portion of the opinion just quoted the court has emphasized the fact that the rights of life, liberty and property are all subject to certain sovereign powers of the state, such as the taxing power, the power of eminent domain and the police power.    Such rights are not therefore in any strict sense either absolute or 'unalienable.'    No man is at liberty to carry on a business injurious to the public morals or health, or to enter into immoral contracts."    And in 6 *R. C. L.* 269

*et seq.* the same principle is stated in this way: "The right to make contracts is not absolute, but is subject to certain limitations. Congress for example, in the regulation of commerce with foreign nations and among the several states may circumscribe the individual's liberty of contract, and the same power may be exercised by any state for the promotion of the health, safety, morals, and welfare of those subject to its jurisdiction. * * * The legislature may deny the right to contract to those who are incapable of binding themselves thereby, or it may prohibit the making of contracts when it becomes necessary to protect the rights of others. The power of the legislature to regulate a business for the protection of the public carries with it the power to control and regulate the right to contract in relation to it. While therefore the right to contract may be subject to limitations growing out of the duties which the individual owes to society, the public, or the government, the power of the legislature to limit such right must rest on some reasonable basis, and cannot be arbitrarily exercised."

And so in respect to this objection also the ultimate inquiry is not whether the Legislature had the power to regulate the making of such contracts as that involved here, for that we regard as settled, but whether the manner in which it regulated them is reasonable.

This statute does not prohibit assignments of earned wages, but it does make certain formalities incident to their execution essential to their validity. That is to say, it requires (1) that they be acknowledged before a justice of the peace in and for the county or city where the assignor resides, and entered on the books of said justice, (2) and that within three days from the execution of such an assignment a copy thereof with certificate of acknowledgment shall be served upon the employer in the same manner as process is served in "chancery," and (3) that if the assignor be married that it be also acknowledged by the husband or wife as the case may be, and (4) that proof of service shall be by the admission thereof by the employer endorsed on the original assignment, and (5) that the

assignor make oath that he has not paid and will not pay more than six per centum per annum interest on the sum borrowed. Assuming that any regulation is permissible, we see nothing unreasonable in the first, second, third and fifth of these requirements, when we remember the evil the Legislature was trying to remedy. They do give to the transaction a certain publicity, but they impose no conditions which the parties to any *bona fide* assignment could not readily perform. If the fourth condition relating to proof of service were to be construed literally it would give to the employer the power to nullify an assignment by refusing to admit service of the copies required to be served upon him, and would be unreasonable and void, but that provision was obviously only designed to afford an alternative mode of service, and not to exclude other proof of service, such as that provided in section 11 or the testimony of any one making actual service on the employer. These conclusions are, we think, supported by sound reason and the weight of authority, although there is some conflict in the decisions dealing with the question. In *Shafer* v. *Union Mining Co.,* 55 Md. 81, this Court said, in referring to a contention made in that case that the statute there involved prevented any assignment: "To accord to this law the construction contended for by the appellee, and which was given it by the learned judge who decided this case below, would be doing unwarranted violence to the rights of the employees over the fruits of their own labor. It would be preventing their use of their wages, which might have been accumulating in the employer's hands, in the purchase of property, real or personal, and taking conveyance therefor. If the employer should be slothful in payment, it would prevent his employee, however straitened for the want of it, using his overdue wages by transfer as other people do their *choses in action.*" But we do not regard that case as in point, because there the court was dealing with an absolute prohibition of an assignment, while we are dealing with the regulation of the manner in which an assignment must be made.

Before referring to the cases dealing with statutes regulating the assignments of wages, we will consider a distinction drawn in some of the cases between statutes which deal with earned and those which relate to unearned wages. But in our opinion there is no logical reason for such a distinction, because the right to earn wages is just as much property and just as much within the protection of the "due process" clause of the Fourteenth Amendment of the Federal Constitution as earned wages.

And if that distinction is not recognized, the case of *Mutual Loan Company* v. *Martell*, 222 U. S. 225, so far as the objection that the act violates the "due process" clause of the Federal Constitution is concerned, is controlling, and in that case it was held that a statute somewhat similar in the general character of its regulatory provisions to that involved in this case, but referring only to unearned wages, was sustained. And in that case the Court made this very significant and pertinent statement: "There are other grounds upon which the statute may be sustained than those expressed by the supreme judicial Court of the State. As we have seen, it does not prohibit assignments of wages to be earned. It prescribes conditions to the validity of such assignments, and in this it has many examples in legislation. It has the same general foundation that laws have which prescribe the evidence of transactions and the manner of the execution and authentication of legal instruments. The laws of the states exhibit in their diversities the power of the legislature over property, its devolution and transfer. It is rather late in the day to question that power." And to the same effect are *Thompson* v. *Erie R. Co.*, 207 N. Y. 171; *Cleveland, etc. R. Co.* v. *Marshall*, 182 Ind. 286; *Fay* v. *Bankers Surety Co.*, 125 Minn. 217; *Ann. Cases*, 1915 C. 688, 43 L. R. A. (N. S.) 146.

The leading case cited by the appellants in support of their contention is *Massie* v. *Cessna*, 239 Ill. 352, but as interpreted by the court in *People* v. *Stokes*, 281 Ill. 159, that case is not necessarily in conflict with the cases cited, except in so far as it treats the regulation of assignments of "salaries" as

distinguished from assignments of "wages" as unreasonable. Referring to that case the court, in *People* v. *Stokes, supra,* said: "The case of *Massie* v. *Cessna,* 239 Ill. 352, is not in conflict with the above view. In that case an act of the legislature which rendered invalid an assignment of wages or salary unless it was in writing and signed by the assignor and duly acknowledged before a justice of the peace and entered upon his docket and notice thereof served upon the employer was held unconstitutional on the ground it applied, not only to the wages of artisans, mechanics, laborers and others employed in various manual occupations, but also to salaries and compensation for personal services of highly salaried officers of corporations and public officers who were not in need of the protection of laws of that kind. * * * It was, however, there pointed out that wage-earners were the proper objects of legislation which would tend to protect them from the evils which this statute was designed to prevent, and that such an act would not be rendered invalid because it placed reasonable limitations upon the right to assign such wages as security for an indebtedness and prescribed a reasonable method to be pursued in making such an assignment effective." That distinction between salaries and wages, however, is in our opinion too refined and delicate to justify us in recognizing it, and it does not appear to have been followed elsewhere. *Cleveland R. R. Co.* v. *Marshall, supra; Fay* v. *Bankers, supra.*

Without further prolonging this opinion, it is sufficient to say that after a careful examination of the cases we have found nothing in this statute in conflict with any provisions of either the State or Federal Constitutions.

From what has been said it follows that we do not regard the requirements of the act as impossible of performance, nor do we find any support for the proposition that it has been repealed by subsequent legislation.

For the reasons stated therefore the decree appealed from will be affirmed.

*Decree affirmed, with costs.*