# Wytheville.

## Edward B. Sweat v. Commonwealth.

### June 13, 1929.

The opinion states the case.

*Tazewell Taylor*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General, M. E. Bristow, Virgil R. Goode*, and *W. H. Cardwell*, for the Commonwealth.

WEST, J., delivered the opinion of the court.

E. B. Sweat was convicted of unlawfully purchasing and taking an assignment of the salary of Geo. A. Benedict, at a rate of discount in excess of ten per cent per annum, and sentenced to pay a fine of $25.00 and costs. This is a writ of error to that judgment.

That portion of sub-section 14, section 1, chapter 300, of the Acts of the General Assembly of Virginia, 1922, as amended by chapter 152 of the Acts of 1928, under which the prosecution was conducted, reads as follows:

"The payment of three hundred dollars or less, in money, credit, goods or choses in action, as the consideration for any sale, assignment, transfer or order for the payment of any wages, salary, commission or other

compensation whatever for services, whether earned or to be earned, shall be deemed a loan within the provisions of this act, secured by such assignment, and the amount by which such assigned compensation exceeds such payment shall be deemed interest upon such loan from the date of such payment to the date of such compensation is payable, which amount shall not, in any case, be more than may be sufficient to yield to the person making such loan interest on his investment at the rate of ten per centum per annum. Such loan and such assignment shall, in all other respects, be governed by and subject to the provisions of this act.

"If judgment be obtained on any loan made under any of the provisions of this act, such judgment shall carry interest at the rate of six per centum per annum and no more.

"The violation of any provision of this act shall be a misdemeanor, punishment for which shall be as prescribed in section eighteen of chapter three hundred of the Acts of Assembly of nineteen hundred and twenty-two.

"All acts or parts of acts inconsistent with this act are hereby repealed."

That portion of section 14 not quoted is admitted to be constitutional.

The case was tried upon an agreed statement of facts entered into between the attorney for the Commonwealth and counsel for the accused, as follows:

"George A. Benedict, witness for the Commonwealth, being first duly sworn, states that on June 18, 1928, he signed the paper hereto attached as Exhibit A, entitled 'offer to sell account due me for salary or wages,' and on the same day signed the paper hereto attached as Exhibit B, entitled 'bill of sale of earned salary or wage account;' that the sum of $20.00 mentioned in said

exhibits as due him for account of salary or wages represented the amount of said salary or wages earned by him for the period of June 11, 1928, to June 16, 1928, both inclusive, as an employee of the Tidewater Creditors Bureau; that the said wages or salary were due and payable by the said Tidewater Creditors Bureau to him on the 23rd day of June, 1928; that the consideration paid him by the Southern Purchasing Company for the assignment of said salary or wages was $19.75; that by said assignment he relinquishes all interest in and to said wages or salary for the period designated, and the said Southern Purchasing Company became the absolute owner thereof.

"The entire transaction as above outlined was conducted so far as the Southern Purchasing Company is concerned by E. B. Sweat, who was acting as the manager thereof. The said application was made to the said manager who informed him that the same was accepted and the assignment of said wages or salary when executed by him was likewise delivered to said manager, who in turn delivered to him the consideration for said assignment, namely $19.75, the entire transaction from beginning to end taking place in the city of Norfolk, Virginia, on June 18, 1928.

"E. B. Sweat, the accused, being first duly sworn, says that he is manager of the Southern Purchasing Company, whose place of business is located at Norfolk, Virginia, and as such manager he is familiar with the operation of said business which is one of purchasing salary assignments; that the said company has been located and doing business in Norfolk approximately four (4) years, and that the average discounts for which salaries are purchased are necessary for the maintenance and operation of the said business, and to charge

a less rate would be to operate the said business at a loss rather than a profit."

The only assignment of error relied on by the plaintiff in error, Sweat, is that sub-section 14 of the act is unconstitutional and that it violates the fourteenth amendment to the Constitution of the United States, and in that the State of Virginia thereby deprives him of his liberty and property without due process of law and also denies him the equal protection of the law.

For some time prior to 1918, the money loan sharks and salary-buyers were doing business in Virginia and elsewhere, and often imposed upon the ignorant and the needy by making small loans to them upon unfair and unjust terms. In 1918, Virginia enacted her first uniform small loan law (Acts 1918, chapter 402) to regulate the manner of conducting this business. Similar legislation has been adopted in more than one-half the States.

Except when salary or wages were assigned as security for small loans, and not until the amendment of sub-section 14, chapter 152 of the Acts of 1928, page 563, had the statute made any reference in express terms to salary buying. The object of this amendment was to regulate the business of salary buying in this State.

Plaintiff in error admits that the first paragraph of sub-section 14, as amended, which restricts the interest charged on loans of the character covered by the act, is constitutional and valid, but contends that the second clause of this section which provides that "any sale, assignment, transfer or order for the payment of any wages, salary, commission or other compensation whatever for services," the payment for which is three hundred dollars or less, shall be deemed a loan within the provisions of the act, secured by such assignment,

and the amount by which such assigned compensation exceeds such payment shall be deemed interest upon such loan from the date of such payment to the date such compensation is payable, which amount should not in any case be more than ten per cent per annum, and that such assignment should in all other respects be governed by and subject to the provisions of this act, violates the fourteenth amendment to the Constitution of the United States.

Succinctly stated, the plaintiff in error contends that the effect of this amendment is to prevent a person to whom salary or wages are due from making a free and untrammelled disposition of the same, thereby depriving the person of his liberty and property without due process of law.

It is true that the Constitution guarantees the citizen the right to make contracts by which he acquires or disposes of his property.

In *Coppage* v. *Kansas*, 236 U. S. 14, 35 S. Ct. 243, 59 L. Ed. 441, L. R. A. 1915C, 960, the court said: "Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist—to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money."

The opinion in the *Coppage Case*, *supra*, concedes,

however, that there are many cases in which legislative interference with contracts is upheld.

In *Tyson & Bro.* v. *Banton*, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236, the question involved was the validity of an act of the legislature of the State of New York prescribing the price at which theatre tickets should be sold. The court held that the sale of theatre tickets was a private transaction not affected with a public interest and that there was no justification for legislative regulation of the price at which the tickets were sold, and that the act was invalid. In the course of the opinion the court said:

"In the endeavor to reach a correct conclusion in respect of this inquiry, it will be helpful, by way of preface, to state certain pertinent considerations. The first of these is that the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself (*State Freight Tax Case*, 15 Wall. 232, 278, 21 L. Ed. 146, 162), and, as such, within the protection of the due process clauses of the fifth and fourteenth amendments. See *Carrollton* v. *Bazzette*, 159 Ill. 284, 294, 42 N. E. 837, 31 L. R. A. 522. The power to regulate property, services or business can be invoked only under special circumstances; and it does not follow that because the power may exist to regulate in some particulars it exists to regulate in others or in all.

"The authority to regulate the conduct of a business or to require a license comes from a branch of the police power and which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, *Chesapeake & P. Teleph. Co.* v. *Manning*, 186 U. S. 238, 22 Sup. Ct. Rep. 881, 246, 46 L. Ed. 1144, 1147, but exists only where the business or the property involved has become 'affected with a public interest.' "

In *Charles Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280, the court, in passing upon the validity of an act of the Kansas legislature which authorized its industrial court to fix the wages of persons employed in the production of clothing, food and other necessaries, speaking through Mr. Chief Justice Taft, held that the act violated the fourteenth amendment to the Constitution of the United States and deprived the packing company of its liberty and property without due process of law. The court used this language: "It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, or the tailor, the wood chopper, the mining operator, or the miner, was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation. It is true that in the days of the early common law an omnipotent Parliament did regulate prices and wages as it chose, and occasionally a colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use, or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances."

At page 15 of the petition the plaintiff in error admits that the legislature has the power to pass acts reasonably regulating assignments of salaries and wages.

The defendant in error admits that the effect of the statute of 1928 is to regulate the business of salary buying and is a restraint upon the power to contract, but contends that in the exercise of the police power, where the public interests may be injuriously affected,

the right of contract may be legally subjected to the limitations contained in sub-section 14 of the Acts of 1928, as amended.

In 12 C. J., at page 949, we find this: "Liberty of contract, however, is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. The right is limited by the commerce clause of the Federal Constitution and by acts of Congress passed in pursuance thereof in regulation of interstate and foreign commerce. It is also subject to the police power of the State to place restrictions on it in the interest of the general welfare. * * * The constitutional guaranties do not prohibit the legislature from prescribing the manner in which contracts or mortgages shall be made, or from providing that certain liabilities shall follow from making or entering into certain kinds of contracts, or from passing laws for the protection of individuals or classes of individuals against fraud or unfair dealing * * *."

In 6 R. C. L., page 12, the law is stated thus: "The right of contract is subject to certain limitations which the State may lawfully impose in the exercise of its police power, and if a contract be one which the State, in the legitimate exercise of its police power, has the right to prohibit, it is not prevented from prohibiting it by the fourteenth amendment. * * * The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to affect injuriously the public interests. A statute limiting the right of a citizen to contract with reference to his property must tend to promote the public good in some way, or it is an unwarranted interference therewith."

In *Chicago, B. & O. R. Co.* v. *McGuire*, 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328, the court, holding that liberty of contract is subject to police regulation, stated the law thus: "It has been held that the right to make contracts is embraced in the conception of liberty as guaranteed by the Constitution. *Allgeyer* v. *Louisiana,* 165 U. S. 578 [17 S. Ct. 427, 41 L. Ed. 832]; *Lochner* v. *New York,* 198 U. S. 45 [25 S. Ct. 539, 49 L. Ed. 9373 Ann. Cas. 1133]; *Adair* v. *United States,* 208 U. S. 161 [28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764]. In *Allgeyer* v. *Louisiana, supra,* the court, in referring to the fourteenth amendment, said (page 165 U. S. 589 [17 S. Ct. 431] 589): 'The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purpose above mentioned.' But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interest of the community. *Crowley* v. *Christensen,* 137 U. S. 89, [11

S. Ct. 13, 34 L. Ed. 620]; *Jacobson* v. *Massachusetts*, 197 U. S. 11 [25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765]. 'It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power of making any contract releasing himself from negligence, and indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property.' *Frisbie* v. *United States*, 157 U. S. 165, 166 [15 S. Ct. 586, 39 L. Ed. 657]."

In *International Text Book Co.* v. *Weissinger*, 160 Ind. 349, 65 N. E. 521, 65 L. R. A. 599, 98 Ann. St. Rep. 334, an act forbidding the assignment of future wages to become due to employees was held constitutional. The court said: "The situation of these persons renders them peculiarly liable to imposition and injustice at the hands of employers, unscrupulous tradesmen, and others who are willing to take advantage of their condition. Where future wages may be assigned, the temptation to anticipate their payment, and to sacrifice them for an inadequate consideration, is often very great. Such assignments would, in many cases, leave the laborer or wage-earner without present or future means of support. By removing the strongest incentive to faithful service—the expectation of pecuniary reward in the near future—their effect would be alike injurious to the laborer and his employer. It is clear

that the object of the act of 1899, *supra*, was the protection of wage-earners from oppression, extortion, or fraud, on the part of others, and from the consequences of their own weakness, folly, or improvidence. We cannot say that no just ground existed for such legislative interference for so commendable a purpose."

In *Heller* v. *Lutz*, 254 Mo. 704, 164 S. W. 123, L. R. A. 1915B, 191, the court sustained the constitutionality of a statute prohibiting the assignment of future wages. In the course of the opinion, the court says: "The exercise of the police power as evidenced by various phases of legislation affecting individual liberty or personal rights, has met with judicial approval in many cases, the rule to be deduced therefrom being that in civilized society there is no such thing as an unrestrained power on the part of the individual to contract, this right being subject to wise and beneficial police regulations; and when an act which may prove detrimental to the public welfare is prohibited by a general statute, it will be upheld unless it is clearly in violation of some provisions of the organic law. (*Grimes* v. *Eddy*, 126 Mo. 168 [28 S. W. 756], 26 L. R. A. 638 [47 Am. St. Rep. 653]; *State ex Inf.* v. *Firemen's Fund Ins. Co.*, 152 Mo. 1 [52 S. W. 595], 45 L. R. A. 363; *Karnes* v. *A. M. F. Ins. Co.*, 144 Mo. 413 [46 S. W. 166]; *Morrison* v. *Morey*, 146 Mo. 543 [48 S. W. 629].)"

In *Spielberger Brothers* v. *Brandes*, 3 Ala. App. 590, 58 So. 75, a statute declaring that assignment of salary and wages to be earned in the future shall be void, is held to be valid as a police regulation.

In *Mutual Loan Company* v. *Martell*, 222 U. S. 225, 32 S. Ct. 74, 56 L. Ed. 175, Ann. Cas. 1913B, 529, the court held constitutional a Massachusetts statute making invalid against the employer of a person any assign-

ment or order for wages to be earned in the future to secure a loan of less than $200.00 until the order is accepted in writing by the employer and recorded. At page 232 of 222 U. S. (32 S. Ct. 74) the court says: "This court has had many occasions to define, in general terms, the police power and to give particularly the definitions by special applications. In *Chicago, Burlington & Quincy Ry. Co.* v. [*Illinois Ex. rel. Grinwood*] *Drainage Commissioners*, 200 U. S. 561, 592 [26 S. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175], it was said that 'the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety,' and that the validity of a police regulation 'must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable and whether really designed to accomplish a legitimate public purpose."

At page 234 of 222 U. S. (32 S. Ct. 75) the court further says: "There must, indeed, be a certain freedom of contract, and, as there cannot be a precise, verbal expression of the limitations of it, arguments against any particular limitation may have plausible strength, and yet many legal restrictions have been and must be put upon such freedom in adapting human laws to human conduct and necessities. A too precise reasoning should not be exercised, and before this court may interfere there must be a clear case of abuse of power. See *Chicago, B. & Q. R. R. Co.* v. *McGuire,* 219 U. S. 549 [31 S. Ct. 259, 55 L. Ed. 329], where the right of contract and its limitation by the legislature are fully discussed."

In *Purity Extract Co.* v. *Lynch,* 226 U. S. 192, 33 S. Ct. 44, 57 L. Ed. 184, the court speaks thus: "With

the wisdom of the exercise of that judgment the court has no concern; and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the legislature, a notion foreign to our constitutional system.''

In the case of *Merrick* v. *Halsey & Co.*, 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498, in which the constitutionality of the Michigan ''blue sky law'' regulating the sale of securities was sustained, the court, at page 587 of 242 U. S. (37 S. Ct. 231), says: ''It (the statute) burdens honest business, it is true, but burdens it only that under its forms dishonest business may not be done.''

In *Otis* v. *Parker*, 187 U. S. 609, 23 S. Ct. 170, 47 L. Ed. 323, the court says: ''If the State thinks that an admitted evil cannot be prevented except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the substance of the matter, they can see that it 'is a clear, unmistakable infringement of rights secured by the fundamental law.' *Booth* v. *Illinois*, 184 U. S. 425, 429 [22 S. Ct. 425, 46 L. Ed. 623].''

In *Wight* v. *B. & O. Ry. Co.*, 146 Md. 66, 125 Atl. 881, 37 A. L. R. 864, and in *Palmore* v. *B. & O. Ry. Co.*, (Md.) 142 Atl. 495, the Maryland statute, which is practically identical with sub-section 14 of the Virginia act of 1928, *supra*, is held constitutional and valid. The only difference is that the Maryland statute permits a larger compensation to the salary buyer.

The provision of the Maryland statute, corresponding with sub-section 14 of the Virginia act is found in section 16 of Article 58-A of the Maryland Code, and

reads thus: "The payment of three hundred dollars
($300.00) or less in money, credit, goods or things in
action, as a consideration for any sale, assignment or
order for the payment of wages, salary, commissions or
other compensation for services, whether earned or to be
earned, shall be deemed a loan within the provisions of
this article secured by such assignment, and the amount
by which such assigned compensation exceeds such
payment shall be deemed interest upon such loan from
the date of such payment to the date such compensa-
tion is payable. Such loan and such assignment shall
be governed by and subject to the provisions of this
article."

We quote with approval from the opinion of the
court in the *Palmore Case, supra*, sustaining the validity
of the Maryland act, as follows:

"The sole question presented by this appeal is the
validity *vel non* of section 16 of Article 58-A of the Code,
as above stated.

"The appellee, in support of his contention that the
act is valid, and not subject to objection under either
the State or Federal Constitution, relies upon the de-
cision of this court in *Wight* v. *Baltimore & Ohio Rail-
road Co.*, 146 Md. 66, 125 Atl. 881, 37 A. L. R. 864, in
which we held valid the act of 1906, chapter 399,
codified as sections 11 to 17, inclusive, of Article 8 of
the Code, titled 'Assignment of Choses in Action.'

"By the last named article, all assignments of wages
or salary in any amounts are declared to be invalid,
unless certain requirements are followed, and by section
14 of that article, sales, under the term 'Assignments,'
are included therein.

"It was contended by the appellant in *Wight* v. *B.
& O. Railroad Co., supra*, that the assignment in that

case was valid because of the unconstitutionality of said act of 1906, chapter 399. * *

"In that case we said, speaking through Judge Offutt:

" 'This act is remedial in character and its apparent purpose is to throw around transactions such as that involved in this case such safeguards as will protect the wage earner who may be a party to them from the greed and the rapacity of unscrupulous persons who might exploit his necessities and misfortunes to his loss and their profit. That purpose is certainly within the police power of the State, and the only question open is whether in its attempt to effect that purpose the legislature has in this act violated any of the privileges secured to the citizen by the guaranties of the State or Federal Constitutions. And in dealing with that question we cannot disregard the consideration that any act designed to accomplish such a purpose must be sufficiently definite and comprehensive in its selection of the means and methods designed to effect it to frustrate the energy and ingenuity of the class at whom it is aimed, who so often regard the privilege of exploiting the necessities of borrowers as a vested property right. * * * The act took from the appellants no property, unless the business of buying without regulation or restraint wages at a discount is property. And while, under the facts of this case, we know of no definition of 'property' which could include that privilege, yet if that privilege could be considered property, the appellants were not deprived of it without due process of law, whether we assume that the word 'property' relates to the particular assignment involved in this case or to the privilege of buying such assignments generally as a business. Because there is nothing in the act which purports to affect rights acquired in

transactions prior to its passage, and all transactions after its passage were carried on with knowledge and notice of its existence and subject to its terms. These principles are in accord with the general trend of judicial authority and may be regarded as established. For while the right to pursue any lawful occupation or calling is generally, if not universally, recognized as property within the 'due process' clause of the Federal Constitution, yet on the other hand the right of the State to regulate such a business, when its unregulated operation may injuriously affect the welfare of others, is equally well settled.'

"And further on in the opinion of Judge Offutt, in dealing with the objection that the regulations and statutes under consideration unreasonably restrain the freedom of contract guaranteed to the appellants by the 'due process' clause of the Federal Constitution, said:

██ " 'While it is true as a general rule that all competent persons are free to make any contracts they please which are not contrary to public policy or positive law, that rule is subject to the qualification that the State, in the exercise of its police power and in the public welfare, may regulate and limit that right.' 12 C. J. 948; *Adair* v. *U. S.*, 208 U. S. 161, 52 L. Ed. 436, 28 S. Ct. 277, 13 Ann. Cas. 764; 6 R. C. L. 269. Taylor on Due Process, 493. * * *

"The requirements of the act of 1918, chapter 88, considered in the light of our decision in *Wight* v. *B. & O. Railroad Co.*, *supra*, cannot properly be said to be unreasonable, and we do not understand that the appellant so regards them. His complaint is directed to the succeeding paragraph of that section, which was added thereto by the Acts of 1924, chapter 115, which provides that the 'consideration (when not more than three hundred dollars) for any sale, assignment or order

for the payment of wages, salary, commissions or other compensation for services, * * * shall be deemed a loan * * * secured by such assignment and the amount by which such assigned compensation exceeds such payment shall be deemed interest upon such loan * * * to be governed by and subject to the provisions of this article.'

"It was specially provided by the Acts of 1906, chapter 399, that the term 'assignment' therein used included the sale of wages of any persons, or of any interest therein. The Acts of 1918, chapter 88, did not, it seems, include sales, and had reference only to loans. It was because of such omission, no doubt, that said act was amended by the Acts of 1924, chapter 115, which included within its provisions sales, assignments, or orders for the payment of wages, etc. The act, as amended, including sales of wages within its provisions, cannot be distinguished from the Acts of 1906, chapter 399, which also included sales within its provisions, and which we held in *Wight* v. *B. & O. Railrod Co.* not to be unreasonable and consequently valid."

In conclusion, we are of opinion that while the authorities are divided the greater weight of authority supports the contentions of the Commonwealth, the defendant in error, and the law as laid down in the *Wight* and *Palmore Cases, supra,* declaring theMaryland act to be constitutional and valid.

The legislature of Virginia, in the exercise of its police power and in an effort to correct a condition reasonably calculated to injuriously affect the general welfare, had the authority and the right to limit and regulate the power to contract in the manner it has done in sub-section 14, *supra,* and said section, as amended, does not contravene the Constitution of the

United States nor the Constitution of the State of Virginia.

Therefore the judgment will be affirmed.

*Affirmed.*