PERSONAL FINANCE COMPANY, APPELLANT, V. GILINSKY FRUIT. COMPANY ET AL., APPELLEES.

FILED JUNE 22, 1934. NO. 28995.

*Abrahams & O'Connor,* for appellant.

*Gaines, McLaughlin & Gaines, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and THOMSEN, District Judge.

THOMSEN, District Judge.

A demurrer was sustained by the district court to a petition attempting to recover on an assignment of wages made in Council Bluffs, Iowa. Plaintiff and defendant assignor are residents of Iowa. The employer, the other defendant, is in Omaha, Nebraska. The assignment is security for a loan bearing 3½ per cent. a month interest. The petition alleges the validity of the contract under the small loans statutes of the state of Iowa. The assignment fails to comply with our statutes in that it provides for a substantially higher rate of interest. Comp. St. 1929, sec. 45-120. The question presented is the validity of the order of dismissal, the plaintiff electing to stand on his petition.

It is our view that plaintiff's petition does not state a cause of action, in that, though the assignment may be valid under the laws of the state of Iowa, it is contrary to the settled public policy of this state. Ordinarily, assignments of this character are judged as to their validity by the law of the state where the assignment is made, but if the enforcement of the contract is contrary to the public

policy of the state in which its enforcement is attempted, the law of the latter state will prevail. 12 C. J. 473. The rule is an old one. *Varnum v. Camp*, 13 N. J. Law, 326; *Herschfeld v. Dexel*, 12 Ga. 582; *Guillander v. Howell*, 35 N. Y. 657.

Only slight consideration of circumstances attending this legislation is required to distinguish these laws from the conventional type against usury. The latter were to guard against excessive rates; the former to combat those which were extortionate and oppressive. Rates as high as 1,300 per cent. were being charged; about one family in five of all American cities in which the population exceeded 25,000 were victims of loan sharks, according to an impartial authority. Russell Sage Foundation 1932 book on small loan legislation, page 54.

"The evils against which the law is directed had become a public scandal. The rapacity of money-lenders who impounded chattels and wages to secure small loans to those in pecuniary distress had become intolerable. Persons engaged in that business were practically uncontrolled. Many of their operations were secret, but the iniquity of their compensation for the use of money created a demand for the restraints of police power. The act in controversy not only puts a limit on exactions for the use of money, but provides punishment for the violation of its provisions and opens to official scrutiny the transactions of all who are authorized to charge limited fees in addition to interest at the rate of 10 per cent. per annum." Judge Rose in *Althaus v. State*, 99 Neb. 465. See, also, *Wight v. Baltimore & O. R. Co.*, 146 Md. 66, 37 A. L. R. 864, and note.

The legislature has thus fixed a limit beyond which, in the interests of public welfare, a contract cannot be enforced. The rate of interest provided in this assignment is beyond the highest lawful rate established by our legislature as a method of destroying a baleful economic practice. The fact that the excess rate is not glaringly higher than our lawful rate makes the violation less apparent,

but no less unlawful. The court is not required by rules of comity to enforce a contract so contrary to our public policy.

The demurrer was properly sustained.

AFFIRMED.

DAY, J., dissenting.

I am unable to concur in the majority opinion and therefore respectfully dissent to the views expressed therein. Another judge prepared a memorandum which so clearly expresses my views that I adopt it in full.

Two questions present themselves: Whether the contract is enforceable in this state, and whether the forum chosen and the procedure are proper. As to the first, it is necessary to examine into the history of small loan legislation.

On ordinary contracts Nebraska's highest lawful rate of interest is 9 per cent. Necessities of small debtors and of their protection have forced legislation granting much higher interest rates. Small loan legislation was passed in this state in 1915 in some measure comparable to the uniform laws passed in other states. Comp. St. 1929, sec. 45-112 et seq. Prior to this beneficial legislation the condition of the country with respect to small loans is summarized from the report of many cases by the Russell Sage Foundation in its 1932 book on "Small Loan Legislation," page 54, as follows:

"The rates charged by the loan sharks were exorbitant: 120 per cent. a year, 260 per cent., 360 per cent., 650 per cent., or even 1,300 per cent. a year. (Citing court decisions.) A wage-earner securing a loan at such excessive rates could, of course, not easily extricate himself from debt. Often he dared not appeal to his employer. He could but pay his periodic assessment to the loan shark; he was, in effect, a peon. As a United States judge expressed it, these practices had 'brought on conditions which were yearly reducing hundreds of laborers and other small wage-earners to a condition of serfdom in all but name.' The best procurable evidence showed that in

the American cities of over 25,000 inhabitants *about one family in five was a victim of loan sharks.* (Italics ours.)

"The social importance of the situation caused the Russell Sage Foundation to have a study of conditions made in 1908. * * * The semi-philanthropic societies, organized by public-spirited citizens and limited in their dividends, had not only maintained their existence but had developed. They were themselves a means of combating the unscrupulous commercial lenders. In 1909 there were 15 such societies located in 14 of the largest American cities. Twelve of them were doing in whole or in part a chattel-mortgage business at an average charge of about 30 per cent. per annum. Since these societies were competing with loan sharks and were composed of prominent citizens who knew their methods and were able to secure the influence necessary for new legislation, they were in a peculiarly auspicious social position.

"At the suggestion of the Russell Sage Foundation these 15 societies met in 1909 and formed the National Federation of Remedial Loan Associations. The Foundation continued to foster the societies by establishing a Division of Remedial Loans."

An exhaustive investigation by the Foundation covering many years, as shown in this report, has established a rate of 3½ per cent. per month as a fair, commercially practicable one, and that is now generally held to be a practical rate for operation of these societies. Reference to the book before quoted (page 113 et seq.) shows enactment into law of the suggested uniform small loan legislation in substantially the form adopted in Iowa in about 30 states of the Union.

The Nebraska statute differs in the apparent rate of interest, the statute providing for 10 per cent. annually on deferred payments, but allows a 10 per cent. brokerage fee semiannually, and is criticized as being possible of a higher rate of interest than the uniform act suggested, the foregoing authority (page 71 and note) citing an instance in Nebraska in which a rate of 50 per cent.

per annum could lawfully be charged under certain conditions, and classifying the law as being subject to this criticism, that "the charges could therefore be easily manipulated."

Since all this legislation is remedial in character, passed for the purpose of protection of the small loan borrower against extortion, and since the value is so clearly apparent, it cannot be said, as a matter of law, that the Iowa statute, because it differs slightly from ours, is contrary to the public policy of this state; on the other hand, it is apparent that, since our own legislation was passed for the purpose of accomplishing the very results heretofore suggested and overcoming the evils theretofore existing, our public policy approves legislation of the character of the Iowa statute involved. The loan here under investigation in the course of regular events would require twenty months for its repayment. For the purpose of a comparison of rates, a computation of total interest on deferred payments if regularly reduced during this period of time would show a total interest of about $36.75 or an actual average rate of 21.6 per cent. per annum, although obviously the debtor would not have the use of the total loan during the entire time. On the same basis a computation of total interest, plus semiannual brokerage fees on renewal, under the Nebraska statute, would produce 20.24 per cent. per annum or a total of about $33.74 for twenty months. Because of all the foregoing we see nothing obnoxious in the enforcement of the Iowa law. Moreover, laws against usury do not ordinarily furnish the foundation for "public policy" so as to prevent enforcement of interest on a foreign contract lawful where made. 39 Cyc. 892. See *Phinney v. Baldwin*, 16 Ill. 108, where a 60 per cent. per annum California note, lawful where made, was enforced in Illinois.

The question, "May a partial assignment of wages, although unassented to by the debtor, be enforced against him in equity?" is argued in the brief of counsel for the plaintiff. It was suggested on the oral argument by plain-

tiff's counsel (at which argument the defendants' counsel did not appear) that this question was the only one presented in the court below. If raised below, defendants seem to have abandoned the proposition, for no mention of it is made in their brief, thus impliedly conceding the correctness of an affirmative. Since no issue of the question is raised by defendants, discussion by the court becomes unnecessary and we decline to pass on it, although the question seems easy of solution. Restatement, Contracts, sec. 156, and Nebraska Annotations under this section; also annotation in 80 A. L. R. 414.

Some question is raised about the assignment, but, though made in Iowa, it complies substantially with our statute. At any rate, the assignment is merely collateral to the debt. 66 C. J. 155. Moreover, generally, debts have no situs or locality but follow the person to whom such debts are owing. *Cooper v. Beers,* 143 Ill. 25; Story, Conflict of Laws (8th ed.) sec. 362; 12 C. J. 471. So, generally, "The validity and effect of an assignment or transfer (of a debt) * * * is determined by the law of the place where the transfer takes place." 12 C. J. 473.

From the pleadings it is apparent that the contract is a valid one in Iowa. If valid there, it is valid here (5 R. C. L. 981, sec. 62; *Joslin v. Miller,* 14 Neb. 91; *Benton v. German-American Nat. Bank,* 45 Neb. 850; *International Harvester Co. v. McAdam,* 142 Wis. 114, 26 L. R. A. n.s. 774) even though the security to which it applies would be considered to have its situs in Nebraska. *Sands v. Smith,* 1 Neb. 108, 93 Am. Dec. 331; 66 C. J. 153, 154, 155; *Coad v. Home Cattle Co.,* 32 Neb. 761; also, 11 Ann. Cas. 225. In any event, the contract being in some aspects more favorable to the debtor than our own statutory law, conscience does not dictate more than ordinary resistance to its enforceability. That high interest rates should apply to those least able to bear such burden, and low rates to those who could well pay more, is the disturbing factor in hearty approval of these laws. The fact that progress has been made in reducing interest to rates less extor-

tionate has some allaying effect, but only in arousing belief in an ultimate solution which will be more equitable. However, the wisdom of statutory law is solely for the legislature, not the courts. *State v. School District,* 99 Neb. 338; *Stewart v. Barton,* 91 Neb. 96; 5 Dec. Dig. (2d) Constitutional Law, sec. 70 (3).

The petition states a cause of action. The demurrer was improperly sustained.